Shirley BARNES, Frances J. McElroy
and Murrell Thomas, Appellees,

v.

Freeman (Teek) BOSLEY and Paula
Carter, Appellants.

Shirley BARNES, Frances J.
McElroy, Appellants,

and

Murrell Thomas,

v.

Freeman (Teek) BOSLEY and Paula
Carter, Appellees.

Shirley BARNES, Frances J. McElroy
and Murrell Thomas, Appellant,

v.

Freeman (Teek) BOSLEY and Paula
Carter, Appellees.

Nos. 83–2127, 83–2178 and 83–2179.

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1984.

Decided Sept. 27, 1984.

Rehearing Denied Oct. 26, 1984.
Rehearing En Banc Denied
Dec. 14, 1984.

502

Bussey & Jordan, St. Louis, Mo., for appellants.

Charles R. Oldham, and Thomas E. Bauer, St. Louis, Mo., for Barnes, McElroy and Thomas.

Before HEANEY, BRIGHT and JOHN R. GIBSON, Circuit Judges.

HEANEY, Circuit Judge.

This action arose out of the dismissals of Shirley Barnes, Frances J. McElroy and Murrell Thomas from their positions as employees in the Clerk's Office of the Circuit Court of the City of St. Louis. The plaintiffs, all political supporters of the previous Clerk of Court, were dismissed when the newly elected Clerk took office. They subsequently filed a complaint alleging violations of their first, fifth and fourteenth amendment rights under 42 U.S.C. § 1983. They also alleged a conspiracy to violate their civil rights under 42 U.S.C. §§ 1985 and 1986.

The district court found all the plaintiffs were fired because of their political affiliations, but that only McElroy and Barnes were protected by the first amendment because they were dismissed from jobs in which political affiliation was not an appropriate requirement. The court found that Thomas had no first amendment protection because he was transferred into a ministerial position just before the new clerk took office to avoid dismissal. The court also found against the plaintiffs on their other claims. The defendants appeal the judgment in favor of Barnes and McElroy; the plaintiffs cross-appeal the judgment against Thomas and their other claims, and the award of attorneys' fees.

Because we find the district court used the proper legal standard and its findings were not clearly erroneous, we affirm the judgment as to McElroy and Barnes. We view Thomas's transfer from an unprotected position to a protected position as irrelevant to the first amendment analysis and reverse the judgment against him. We increase the award of attorneys' fees to take into account the success of Thomas's claim.

## I. BACKGROUND.

Barnes, McElroy and Thomas were employed as Deputy Circuit Clerks for the St. Louis Circuit Court prior to January 3, 1983. All three were long-term employees who had been hired under the patronage system at low level jobs and had worked their way up into management positions. At the time of Barnes's dismissal, she was a Unit Manager I in charge of ten departments. McElroy started out as a janitor-messenger in 1963. He was promoted five times and was a Unit Manager II at the time of his dismissal. Thomas also began as a janitor-messenger and had worked for the Clerk's Office for over nineteen years.

He had been promoted to Administrative Assistant I. Two weeks prior to the changeover in circuit court clerks, he was transferred from Administrative Assistant I to Courtroom Clerk III, a demotion in responsibility but with no change in salary.

Joseph P. Roddy was the Circuit Court Clerk, an elected position, from 1968 to 1983. All three plaintiffs were members of the "Roddy faction" within the Democratic Party in the City of St. Louis: the defendants stipulated that McElroy was politically affiliated with Roddy; Thomas had been active in Roddy's Seventeenth Ward organization since 1972; Barnes had been Roddy's campaign treasurer from 1973 through December, 1982. In August of 1982, Freeman Bosley, Jr., defeated Roddy in the Democratic primary. Bosley subsequently won the general election and was sworn into office on January 1, 1983.

During the time between the general election in November of 1982 and January 1, 1983, Bosley appointed a transition team to review the operations of the Clerk's Office. The team members were Frank McGhee, who had worked in Bosley's phone bank during the campaign; Paula Carter, office manager for Bosley's campaign headquarters; Jimmy Edwards, Bosley's legal adviser during the campaign; and Charles Hoehn, campaign manager for a third candidate during the primary who later advised Bosley in his campaign. After interviewing over forty employees in the office, the transition team recommended firing the three plaintiffs and Roddy's legal adviser, Thomas Bauer. Bosley fired all of these people three days after taking office. Almost immediately, he appointed Hoehn to McElroy's position, Carter to Thomas's position, and McGhee to Barnes's position. The plaintiffs then instituted this action.

The district court held that the plaintiffs had succeeded in proving that their political affiliation with Roddy was the sole reason they were dismissed. Although the defendants had contended the plaintiffs were incompetent and their replacements were better qualified, the district court specifically found that Bosley would not have fired the plaintiffs if they had not supported the Roddy faction. The court acknowledged that the plaintiffs had held management and supervisory positions, but held that political affiliation was irrelevant in exercising the circumscribed discretion attendant to those positions. McElroy and Barnes thus succeeded in their first amendment claim. As to Thomas, however, the court held his transfer should be disregarded because it was made to avoid possible dismissal. The court deemed the Administrative I position held by Thomas before the transfer as one in which political affiliation was an appropriate requirement. The court also entered judgment in favor of the defendants on the plaintiffs' due process and sections 1985 and 1986 claims. McElroy and Barnes were ordered reinstated with back pay and the court subsequently awarded attorneys' fees in the amount of $12,700.

## II. DISCUSSION.

The defendants claim: (1) that the district court erred in failing to balance the plaintiffs' first amendment rights against the government's interest in efficient management; (2) that the district court's finding that the plaintiffs were terminated for political reasons is clearly erroneous; and (3) that even if the plaintiffs were terminated for political reasons, the district court clearly erred in finding that political affiliation was not an appropriate requirement for their positions. In his cross-appeal, Thomas contends the district court should not have disregarded his transfer in determining whether he too occupied a protected position at the time he was dismissed. We disagree with the defendants' assertions, but agree with Thomas.

### A. Legal Precedents.

The seminal Supreme Court cases dealing with public employee terminations based on political affiliations are *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkle,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574

(1980). In *Elrod,* a plurality of the Court held that the newly elected Sheriff of Cook County, Illinois, could not terminate employees merely because they were not members of the Democratic Party and failed to obtain the sponsorship of one of its leaders. *Elrod v. Burns, supra,* 427 U.S. at 351, 96 S.Ct. at 2678. Writing for the plurality, Justice Brennan reasoned that because the sheriff's employees had to join and work for the Democratic Party in order to retain their jobs, the system necessarily coerced employees into compromising their true beliefs. In his view, this use of governmental power to prescribe political beliefs struck at the heart of the first amendment and thus the patronage system in its blanket application to all employees at all levels of government work was unconstitutional. *Id.* at 356–357, 96 S.Ct. at 2681–2682.

Justice Brennan further reasoned that an unconstitutional condition may not be placed on the receipt of a public benefit. *See Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 605, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967). In *Perry,* the Court stated:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which

[it] could not command directly." * * * Such interference with constitutional rights is impermissible.

*Perry v. Sindermann, supra,* 408 U.S. at 597, 92 S.Ct. at 2697 (citation omitted).

Justice Brennan concluded that a person's political beliefs could not be the sole basis for depriving him or her of continued public employment unless the government could demonstrate an overriding interest. *Elrod v. Burns, supra,* 427 U.S. at 368, 96 S.Ct. at 2687. Justice Stewart's concurring opinion accepted this latter ground for invalidating dismissals based on political affiliation.

■ As both opinions in *Elrod* recognized, party affiliation may sometimes be an acceptable requirement for some types of government employment. Public employees' first amendment rights may have to yield to the government's vital interest in maintaining governmental effectiveness and efficiency if their private political beliefs would interfere with their public duties. *Id.* at 366, 96 S.Ct. at 2686. The plurality concluded, however, that the governmental interest in effectiveness and efficiency is only seriously threatened when an employee with an opposition party viewpoint is in a policymaking and confidential position. Employees in those positions are thus vulnerable to dismissal for their political affiliation. *Id.* at 372–375, 96 S.Ct. at 2689–2691.

■ In *Branti v. Finkel, supra,* 445 U.S. at 518–519, 100 S.Ct. at 1294–1295; the Supreme Court clarified the criteria to be used in determining which employee positions are not protected under *Elrod.* In *Branti,* two Republican assistant public defenders were fired from their jobs when a Democrat was appointed as their supervisor. The supervisor contended on appeal that assistant public defenders hold policymaking and confidential positions and should be subject to firing when a new party takes power.[1] The Court disagreed,

---

1. The other contention on appeal was that *Elrod* was limited to situations in which government employees are coerced into pledging allegiance to a political party they would not voluntarily support and does not apply to the simple requirement that an employee be sponsored by

holding that the inquiry is whether political affiliation is an appropriate requirement for a position, not whether it is confidential or policymaking in nature. The court recognized that some employees make policy and receive confidences about matters wholly unrelated to their political viewpoint. The court compared a football coach to a governor's aide. Both make policy, but only the latter's political affiliation is relevant to those policies. The Court concluded that allegiance to a political party is not an appropriate condition of employment for a public defender whose primary responsibility is to represent citizens in controversy with the state.

### B. The Instant Case.

Initially, we address the defendants' contention that the district court should have used the balancing test set out in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in determining whether the plaintiffs' first amendment rights were violated. The *Pickering* balancing test is usually the first level of analysis in first amendment cases. *Bowman v. Pulaski County Special School District*, 723 F.2d 640, 643 (8th Cir.1983). By balancing the interest of the public employee, as a citizen, in commenting upon matters of public concern against the state employer's interest in promoting the efficiency of the public services it performs, the court determines whether the employee's conduct is protected by the first amendment. *Id.* 391 U.S. at 568, 88 S.Ct. at 1734. If the balance favors the employee, he or she must still prove the protected conduct motivated the dismissal, and the employer may defend by proving independent reasons for any adverse disciplinary action. *Givhan v. Western Lines Consolidated School District*, 439 U.S. 410, 416–

417, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

■ The *Pickering* balancing test need not be used in determining whether the first amendment protects political affiliation. In *Elrod*, the Supreme Court struck the balance between the government's interest in efficient management and the public employee's interest in free political association. The Court held that political affiliation is always protected unless the employee occupies a position that requires a political viewpoint which is in harmony with the viewpoint of his or her supervisor.

Upon reviewing the evidence introduced at trial, we are convinced the trial court did not clearly err in its finding that political motives prompted the plaintiffs' dismissals.[2] The court cited the following factors to support its finding: (1) the plaintiffs were discharged three days after Bosley was sworn in; (2) Bosley wrote to a judge on the circuit court regarding the discharge of the plaintiffs (although they were unnamed in the letter) before they were interviewed by the transition team; (3) the transition team interviews with Barnes and McElroy did not touch to any significant extent upon the plaintiffs' qualifications or job history; (4) the plaintiffs were close political affiliates of Roddy; (5) the termination letter stated the plaintiffs were being terminated from "policymaking and/or nonconfidential position[s];" and (6) Bosley made public statements to the effect that he had the desire and right to bring his own team into the clerk's office. *Barnes v. Bosley*, 568 F.Supp. 1406, 1410 (E.D.Mo. 1983).

the party in power. The Court found this interpretation would repudiate the conclusion in *Elrod* that the first amendment prohibits the dismissal of an employee solely because of his political beliefs. *Branti v. Finkel*, 445 U.S. 507, 516–517, 100 S.Ct. 1287, 1293–1294, 63 L.Ed.2d 574 (1980).

2. The defendants do not contend on appeal as they did below that *Branti* and *Elrod* are inapplicable here because Roddy and Bosley were both Democrats. The district court labeled this contention as "specious," taking judicial notice of the fact that the only real political contests in the City of St. Louis occur at the primary level. *Barnes v. Bosley*, 568 F.Supp. 1406, 1412 n. 7 (E.D.Mo.1983).

The defendants dispute the significance of these factors, maintaining that Bosley fired the plaintiffs because he thought his own management team was better qualified and could do a better job. They point out that the transition team interviewed over forty employees in the Clerk's Office including Barnes and McElroy and studied the operations of the office. In addition, several former Roddy supporters still hold jobs in the Clerk's Office and have not been pressured to change their party allegiances.[3]

██ We nonetheless believe that the evidence is sufficient to uphold the district court's finding. It is evident from the record that Bosley and his transition team gave the plaintiffs' qualifications cursory treatment. The transition team questionnaires for Barnes and McElroy show only a few questions were asked. The team did not interview Thomas at all. Bosley talked to the plaintiffs on January 3 and asked them to submit resumes, but fired them on January 4 before they could submit them. Furthermore, the district court found the plaintiffs were competent in their positions, citing their many years of satisfactory service accompanied by a substantial number of promotions. The court also found the plaintiffs had sufficient education to perform the duties of their respective positions.

Moreover, even if the defendants are correct in asserting that political affiliation was not the sole motivating factor behind the plaintiffs' dismissals, the plaintiffs have still carried their burden of proof because, as the district court found, the defendants failed to show that nonpolitical reasons would have prompted the dismissals in any event. In "mixed motive" cases, where the evidence demonstrates that both legitimate and illegitimate motives may have prompted action against a public employee who engaged in protected conduct, the allocation of the burden of proof is dictated by *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1974). Initially, the burden is on the plaintiff to show that his or her conduct is constitutionally protected and that this conduct was a substantial or motivating factor in the action taken against him or her. The defendant may then defeat the plaintiff's claim by demonstrating that the same action would have been taken in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. at 576.

██ The *Mount Healthy* standard is appropriate in cases where the protected conduct is party affiliation and mixed motives are alleged. *Nekolny v. Painter*, 653 F.2d 1164, 1167–1168 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Wren v. Jones*, 635 F.2d 1277, 1283 (7th Cir.1980), *cert. denied*, 454 U.S. 832, 102 S.Ct. 129, 70 L.Ed.2d 110 (1981); *Tanner v. McCall*, 625 F.2d 1183, 1193 (5th Cir.1980), *cert. denied*, 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). Although *Elrod* and *Branti* were cases in which the Supreme Court accepted the factual finding below that political affiliation was the *sole* motive for firing the plaintiffs, we see no reason to apply a stricter standard for political affiliation cases than is applied in other first amendment cases.[4] In the instant case, therefore, once the plaintiffs established that their political affiliation was a motivating factor in their dismissals, the burden shifted to the defendants to show by a preponderance of the evidence that the plaintiffs would have been discharged in any event.

---

**3.** According to the defendants, these witnesses also testified that Barnes and McElroy were not active in the Roddy faction. An examination of their testimony reveals, however, that they said they did not see Barnes and McElroy at the Seventeenth Ward meetings, but that both were known to be active Roddy supporters.

**4.** The district court opted not to apply the *Mount Healthy* analysis because it found the plaintiffs had met the more difficult burden of proving that political affiliation was the sole motivation behind their discharge. It nevertheless made the appropriate findings for a *Mount Healthy* analysis. *Barnes v. Bosley, supra,* 568 F.Supp. at 1410–1411.

■ The district court found, and we agree, that the defendants failed to carry this burden. The two main themes in the defendants' evidence were that Bosley wanted a new management team and the replacements were better qualified and more competent than the plaintiffs. In weighing the defendants' evidence, the district court looked at the plaintiffs' long years of satisfactory service and the type of skills required by their jobs. The court concluded that the plaintiffs were in fact experienced and competent employees and that they would not have been discharged if they had not been longtime political supporters of the previous clerk. In our view, this finding is not clearly erroneous.

Once it is established that political affiliation motivated the plaintiffs' discharge, the question still remains whether Bosley needed his own political supporters in those positions to insure the smooth functioning of the Clerk's Office. The defendants argue the district court erred in finding political affiliation was not an appropriate requirement for these positions. We disagree.

■ All of the plaintiffs occupied management positions in the Clerk's Office. The district court found, however, that their duties were, for the most part, ministerial. The Missouri Supreme Court had promulgated rules and regulations for the administration of the state court system. As department supervisors, the plaintiffs' main functions were to insure that their departments ran according to the rules. Discretionary decisions were, for the most part, referred to the circuit clerk. The defendants introduced memoranda from McElroy and Barnes in an attempt to prove they held policymaking positions. These memoranda concerned mailing procedures, dress code, and the ordering of office supplies—hardly areas where political affiliation would influence policy. Other employees testified for the defendants that the plaintiffs wielded a lot of influence when Roddy was clerk. We agree with the district court, however, that this influence was because of their political ties to him,

rather than inherent in the positions they held.

After carefully reviewing the record, we believe the district court did not err in finding the plaintiffs' political affiliation was not important to the positions they held. Like the public defenders in *Branti* and the football coach in the Court's example in that case, these plaintiffs' political viewpoints would not influence policymaking in the areas within their discretion. Because the plaintiffs proved the two elements essential to their cases, we affirm the district court's judgment in favor of Barnes and McElroy.

■ For the same reason, we reverse the district court's judgment against Thomas. The only factor distinguishing Thomas's case from the cases of the other two plaintiffs is that he was transferred to a predominantly ministerial position from his position as second in command to the clerk just before Bosley took office. The district court disregarded the transfer because it was done to avoid possible dismissal, and it put the person who was transferred into Thomas's old job in jeopardy of dismissal for political affiliation. Neither of these reasons persuade us that the *Branti* and *Elrod* analyses should not be applied to Thomas's case. Thomas was dismissed because of his political affiliation, even though political affiliation had no relevance to the ministerial position he held at the time Bosley took office. How Thomas got that position is irrelevant. Bosley could have dismissed him as incompetent, or lowered his salary if he thought it was too high for the position Thomas held. Bosley could not, however, dismiss Thomas for political reasons. Since that is what the district court found was done, Thomas must succeed in his action.

■ Because we hold the plaintiffs succeeded on their first amendment claim, we need not address their due process claim and the conspiracy claim brought under 42 U.S.C. §§ 1985 and 1986. We agree with the district court that the evidence in this case does not justify damages for emotional distress. *See Nekolny v. Painter,*

*supra,* 653 F.2d at 1172. We also affirm the district court's award of attorneys' fees, except we increase the award to reflect Thomas's success on appeal. The district court reduced each counsel's billed court time by twenty-five percent to take into account the disposition of Thomas's claims below. We therefore increase the award by that amount for a total award of $13,900.[5] In all other respects, we agree with the district court's determination as to attorneys' fees.

## III. CONCLUSION.

The district court did not err in the bulk of its legal analysis or factual findings in this case. It found that the plaintiffs proved their political affiliation was the motivating factor in their dismissals and that the defendants would not have fired the plaintiffs if they had not been members of the Roddy faction. The court also found political affiliation was not an appropriate requirement for the positions the plaintiffs held at the time of their dismissals. These findings are not clearly erroneous and the judgment in favor of McElroy and Barnes is affirmed. We reverse the judgment against Thomas because we find his transfer irrelevant for purposes of first amendment analysis, and modify the attorneys' fee award accordingly. In all other respects, the district court's judgment is affirmed.

BRIGHT, Circuit Judge, dissenting.

In my view, the result the majority reaches in this case is neither sound as a matter of policy, nor compelled, as a matter of law, by relevant precedent. Specifically, I believe this case to be distinguishable on its facts from the two leading Supreme Court decisions on patronage firing, *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the principal authority on which the majority relies. Therefore I dissent.

This case does not require us to consider the constitutionality of a wholesale purge for political reasons of large numbers of public employees. Here a public official, elected on a promise to improve the management of a 220-member ministerial agency, upon taking office simply replaced four top-level supervisory personnel in the agency with persons of his own choosing. Significantly, he retained all the lower-level employees, including many who were open supporters of the incumbent clerk whom he defeated in the primary.

It seems to me that anyone responsible for the operation of an agency with hundreds of employees and a budget of millions of dollars would want, and should be entitled, to appoint his own principal subordinates. Indeed, efficient, effective administration would seem to depend upon the relationship of trust and confidence between the principal officer and his closest aides, whether that officer is appointed or elected, and whether the agency is public or private. Therefore, in the absence of precedent compelling a contrary result, I would uphold the right of a top official to choose his own close aides.

The leading cases do not compel a contrary result here. In *Elrod v. Burns, supra,* the newly elected Democratic sheriff of Cook County, Illinois, discharged a large number of patronage employees who had been appointed by his Republican predecessor. The reason given for the discharges was simply that jobs were needed as patronage for Democratic loyalists. 427 U.S. at 364 n. 18, 96 S.Ct. at 2685 n. 18. Many of those discharged were reinstated after they changed their party affiliation from Republican to Democrat or obtained sponsorship letters from Democratic leaders. Four employees who were not reinstated brought suit, and the Supreme Court held that their discharge, solely because they refused to affiliate with the Democratic Party and failed to obtain the sponsorship of a party leader, violated their rights of

---

**5.** Each counsel billed twenty-four hours for court time. The court reduced this figure to eighteen hours and awarded Mr. Oldham $125 per hour for court time and Mr. Bauer $75 per hour for court time. We add back in the six hours at the court's established rates.

free belief and association under the first and fourteenth amendments. Justice Brennan, in the plurality opinion,[1] specifically observed that "efficiency and effective government" were not concerns of the sheriff who perpetrated the partisan purge in *Elrod*, 427 U.S. at 364 n. 18, 96 S.Ct. at 2685 n. 18, nor, the plurality commented, could it plausibly be urged that efficient administration would be advanced by "the wholesale replacement of large numbers of public employees every time political office changes hands." 427 U.S. at 364, 96 S.Ct. at 2685.

Likewise, in *Branti v. Finkel, supra*, the Court held unconstitutional the discharge of two assistant public defenders by the newly appointed Democratic public defender of Rockland County, New York. The assistant defenders were discharged solely because they were Republicans and did not have Democratic sponsors. The Court emphasized that the discharged employees' duties extended only to representing the clients assigned to them; they had no supervisory responsibility over other employees and no advisory role to play in the defender's administration of the office:

> Although * * * they had broad responsibilities with respect to particular cases that were assigned to them, * * * [they] had "very limited, if any, responsibility" with respect to the overall operation of the public defender's office. They did not "act as advisors or formulate plans for the implementation of the broad goals of the office" and, although they made decisions in the context of specific cases, "they do not make decisions about the orientation and operation of the office in which they work." * * * [T]hey did not occupy any confidential relationship to the policymaking process * * *.

445 U.S. at 507, 100 S.Ct. at 1287 quoting *Finkel v. Branti*, 457 F.Supp. 1284, 1291 (S.D.N.Y.1978). Indeed, the Court went on

to observe, "The primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State." 445 U.S. at 519, 100 S.Ct. at 1295.

To my mind, the case before us now differs in crucial respects from both *Elrod* and *Branti*. Unlike *Elrod*, this is not a case where the discharging official cannot be said to have had no concern for "efficiency and effective government" when he made the discharges. To the contrary, the need for more efficient management of the clerk's office provided the central theme of defendant Bosley's election campaign. Again unlike *Elrod*, this is not a case where a mass party-based discharge, followed by reinstatement of all but those who failed to change party affiliation or obtain party sponsorship, undermines any possible argument that administrative efficiency justified the discharges. Clerk Bosley, unlike Sheriff Elrod, replaced only a very few key supervisory employees, retaining in office all the other employees, including those who had openly opposed his election. Moreover, there is no dispute that Bosley's appointees had superior credentials in public administration to the Roddy appointees they replaced. Finally, unlike *Elrod*, this is not a case where the discharged officials clearly occupied "nonpolicymaking, nonconfidential" positions. *See Elrod, supra*, 427 U.S. at 375, 96 S.Ct. at 2690 (Stewart, J., concurring in the judgment); *Branti, supra*, 445 U.S. at 517, 100 S.Ct. at 1294.

The distinctions between this case and *Branti* are equally important. The plaintiff officials in this case held high-level, supervisory positions within a large ministerial agency. Their duties naturally included both advising the clerk of court on the administration of the office and carrying out his policy directives.[2] In *Branti*, by contrast, the duties and responsibilities

---

1. The plurality consisted of three justices. Two others, who declined to join in the sweeping language of the plurality opinion, concurred in the judgment, solely because the plaintiff employees clearly held "nonpolicymaking, noncon-

fidential" positions. 427 U.S. at 375, 96 S.Ct. at 2690 (Stewart, J., concurring in the judgment).

2. That the published job descriptions for the positions held by plaintiff-appellants Barnes and McElroy did not specify that they advise the clerk on office administration does not negate

of the assistant attorneys ran primarily to their individual clients, and did not include supervising large numbers of subordinate employees or advising the public defender on office policy or administration. The need for a close relationship of confidence and trust between the clerk of court and his principal deputies in this case, and the lack of such a need between the public defender and the assistant defenders in *Branti*, seem to me clear and compelling.

Accordingly, I disagree with the majority that *Elrod* and *Branti* must control the result here. Nor do I believe that the result the majority reaches will advance the important interests of efficient public administration at stake in this case. Therefore I would reverse the decision of the district court respecting plaintiff-appellants Barnes and McElroy.

I concur in the court's disposition of the claims of plaintiff-appellant Thomas, who was dismissed not from a high-level managerial position but from a position that carried no supervisory or managerial responsibilities.

either (1) the fact, found by the district court, that they performed advisory and confidential duties for former clerk Roddy or (2) the inescapable likelihood that, in administering a 220-person agency, incoming clerk Bosley would have to rely on the heads of the several subdivisions of the agency both for advice as to how administration could be improved and for cooperation and assistance in carrying out managerial policy within the office.